UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA

V.                                                          11 CR 230 (CM)

JOHN STOLARZ,

        Defendant.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/8/20

### DECISION AND ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

    On October 31, 2011, John Stolarz was sentenced by this Court to a 151 months' in prison, in connection with his plea of guilty to attempted bank robbery. Stolarz is currently serving his sentence at FCI Allenwood Medium—his projected release date is February 1, 2022.

    Before the Court is Stolarz's motion asking the Court to grant him compassionate release pursuant 18 U.S.C. §3582(c)(1)(A)(i), as amended by the First Step Act ("FSA"), P.L. 115-391. Stolarz claims that his age (he is now nearly 80 years old), his serious medical conditions (including cardiovascular disease, hyperlipidemia and hypertension), and the spread of COVID-19 at FCI-Allenwood Medium, "constitute 'extraordinary and compelling reasons' to reduce his sentence to time served, and convert the unserved portion of his prison sentence to an additional term of supervised release, so that he can seek safety at a residence in New Jersey." Stolarz Motion at 1.

1

Government opposes Stolarz motion arguing that he has not shown extraordinary and compelling circumstances warranting his release, and that, even if he had, the sentencing factors at 18 U.S.C. § 3553(a), would counsel against release.

Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing "extraordinary and compelling circumstances" warranting release.[1] Until recently, this Court—and many of my district court colleagues—looked to United States Sentencing Guidelines § 1B1.13 (the applicable Guidelines section for sentencing reductions pursuant 18 U.S.C. §

---

[1] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g.*, United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992).

2

3582(c)(1)(A)(i)), for guidance on what constituted "extraordinary and compelling circumstances."[2] That changed on September 25, 2020, when the United States Court of Appeals for the Second Circuit held that § 1B1.13 is not applicable to a motion brought by a defendant in the district court. *United States v. Brooker* No. 19-32180-CR, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020). The Second Circuit reasoned that the language of § 1B1.13—language that has not been updated since the passing of the First Step Act—addressed only sentencing reduction motions initiated by the Bureau of Prisons. *Id.* In making clear that the district court was not constrained by the narrow grounds for granting compassionate release in § 1B1.13, the Second Circuit declared unequivocally that "district courts have discretion to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release," and that "neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id* at *7.

---

[2] The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons" exist. *See* § 1B1.13 comment (n.1). For example, the medical circumstances ground reads as follows:

(A)    Medical Condition of the Defendant.—

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii)    The defendant is—

        (I)    suffering from a serious physical or medical condition,

        (II)    suffering from a serious functional or cognitive impairment, or

        (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

What Brooker did not change, however, is the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must first consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they are applicable, and determine whether they counsel for or against release. A court may still deny compassionate release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

Stolarz's Motion in the Bureau of Prisons

Stolarz made an administrative request for compassionate release to the warden on April 7, 2020—that request was denied on April 10. Accordingly, he has exhausted his administrative remedies with the BOP, and his present motion—filed on October 19, 2020—for compassionate release is properly before this Court.

Stolarz's Motion in the District Court

Post *Brooker*, a court considering an inmate's compassionate release motion based on medical grounds need no longer look to the applicable Application Notes in the Sentencing Guidelines to determine whether the inmates medical condition meets the rigid medical criteria enumerated in the Guidelines that would warrant release. In the context of a compassionate release motion predicated on an inmates poor health and the risk of contracting COVID-19 in a Bureau of Prisons facility, the Court may now recognize the obvious: An inmate (1) in a Bureau of Prisons Facility with a high rate of COVID-19 infections, and (2) who suffers from health conditions found by the Center for Disease Control to place a person at an increased risk of suffering a severe outcome from Covid-19, has met the "extraordinary and compelling" standard warranting compassionate release.

4

Here there is no question that Stolarz, is at risk of suffering a severe outcome if he were to contract COVID-19. First and foremost, Stolarz is 79 years old—14 years older than the 65 years old threshold set by the CDC. *See* Older Adults, https://www.cdc.gov/ coronavirus/ 2019-ncov/need-extra-precautions/older-adults.html.

Second, Stolarz has hypertension, cardiovascular disease and hyperlipidemia; and at least hypertension has been recognized by the CDC and WHO to have "been associated with increased illness severity and adverse outcomes" from COVID–19. *See* CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID–19), https:// bit.ly/3cjQyRM. See also CDC COVID–19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019—United States, February 12–March 28, 2020, at tbl.1, CDC, Morbidity & Mortality Weekly Report (Apr. 3, 2020) ("Prevalence Report"), at 383, available athttps://bit.ly/34A6RqI (concluding, "consistent with findings from China and Italy," that "patients with underlying health conditions and risk factors, including ... hypertension, ... might be at higher risk for severe disease or death from COVID–19"); World Health Org., Report of the WHO–China Joint Mission on Coronavirus Disease 2019 (COVID–19), at 12 (Feb. 24, 2020) ("WHO–China Report") at 12 ("Individuals at highest risk for severe disease and death include ... those with underlying conditions such as hypertension."). The WHO has found that the mortality rate among those with hypertension is 8.4%, compared to 1.4% for those otherwise healthy. *Id*.

I therefore find that Stolarz has an elevated risk of suffering a negative outcome should he become infected by COVID-19.

In regard to the risk of contracting COVID-19 at Allenwood Medium FCI: According to BOP website, there have been 785 COVID-19 tests administered at Allenwood Medium since the Pandemic began, yielding 241 positive results. *See* BOP COVID-19 Dashboard, https://www.bop.gov /coronavirus/ (last visited December 2, 2020. Currently, there are 102 inmates and 8 staff at Allenwood Medium testing positive for the virus.[3] The implementation of the Bureau of Prison's National Multi-Phase Action Plan for combatting COVID-19 (*see BOP COVID-19 Action Plan*, https://www.bop.gov/ resources/ news/20200313_covid-19.jsp., (periodic updates to plan omitted)), appears to have had limited effect in controlling the virus at Allenwood Medium. There is no reason to believe the facility will fare any better during the latest surge in the pandemic. A person like Stolarz—with an elevated risk of suffering a serious outcome from COVID-19—would certainly be better off if he were living in an environment that had a lower infection rate.

Stolarz—having demonstrated that he is in mortal danger if he contracts COVID-19 and that Allenwood Medium has been unable to control the virus in that institution—has met his threshold burden of showing an extraordinary and compelling reason to grant him compassionate release.

But then there are the sentencing factors set forth at 18 U.S.C. § 3553(a) to consider, and that is where this motion becomes difficult. Stolarz criminal history is epic:

- In 1959, the defendant was convicted of illegally wearing an air force uniform on a government reservation in the Southern District of New York and sentenced to a term of imprisonment of six months. PSR ¶¶ 36-37.

---

[3] After dealing with numerous compassionate release motions over the last several months, I have learned that BOP statistical reporting for a particular facility does not always comport with, and often understates the actual infection rate at that facility.

- In 1959, the defendant was convicted of passing fake checks in New York County Supreme Court. He was sentenced to an indeterminate sentence and served approximately 3 years. PSR ¶¶ 38-39.

- In 1964, the defendant was convicted of impersonating an air force officer in the Southern District of New York and sentenced to a term of imprisonment of a year and a day. PSR ¶¶ 40-41.

- In 1964, the defendant was convicted of forgery, breaking and entering, and larceny of a motor vehicle in New Jersey state court and sentenced to a term of imprisonment of three to five years. PSR ¶¶ 42-43.

- In 1971, the defendant was convicted of making a false statement on an income tax return in the District of New Jersey and sentenced to a term of imprisonment of three years. PSR ¶¶ 44-45.

- In 1974, the defendant was convicted of assaulting a postal service employee in the District of Nevada in connection with a post office robbery and sentenced to a term of imprisonment of three years. PSR ¶¶ 46-47.

- In 1975, the defendant was convicted of assault with a dangerous weapon with intent to do bodily harm in the Western District of Washington in connection with a stabbing of another inmate and was sentenced to a term of imprisonment of five years. PSR ¶¶ 48-49.

- In 1980, the defendant was convicted on four counts of bank robbery in the District of Nevada and sentenced to a term of imprisonment ten years. Four other bank robbery charges were dropped at the time in a plea agreement. PSR ¶¶ 51-52.

- In 1981, the defendant was convicted on two counts of robbery in state court in Nevada and sentenced to a term of imprisonment of nine years. PSR ¶¶ 53-5.

- In 1988, the defendant was convicted on three counts of bank robbery in the District of Utah and sentenced to a term of imprisonment of 262 months. In at least one of the robberies, the defendant advised the teller that he was in possession of a bomb. PSR ¶¶ 56-60.

- In 1988, the defendant was convicted on two counts of bank robbery in the District of Nevada but was sentenced in the Utah case above pursuant to Federal Rule of Criminal Procedure 20. In one of the robberies Stolarz displayed a weapon, and in the other he displayed a fake bomb. PSR ¶¶ 61-64.

- In 1989, the defendant was convicted of one count of armed bank robbery in the

7

Eastern District of Louisiana and sentenced to a term of imprisonment of 25 years. Stolarz used a pistol and a fake bomb to commit the robbery. PSR ¶¶ 65-68.

When the Stolarz was arrested before the 1988 and 1989 convictions, he admitted to having robbed a total of 14 banks in the less than three months since he was released from federal custody, and he was not prosecuted for several of those robberies. PSR ¶ 72.

That brings us to the instant offense. In 2010, while serving concurrent sentences for bank robbery—one of 262 months imposed by the District of Utah, and one of 25 years imposed by the Eastern District of Louisiana (PSR ¶ 5)—the BOP transferred Stolarz to a residential reentry center in Salt Lake City (PSR¶ 6). Rather than have BOP officers escort him, however, the BOP provided Stolarz with a bus ticket to the airport in Philadelphia and instructed him to board a flight to Utah from there. *Id.* Stolarz boarded the bus on October 13, but he did not get on the plane to Utah. PSR ¶ 6. Instead, he boarded a bus to Atlantic City and spent the night in a casino. PSR ¶ 6. The next day, he boarded another bus, this time to New York City. PSR ¶ 7. When he arrived, he began searching stores for a toy handgun. PSR ¶ 7. When he could not find one, he bought a knife instead. PSR ¶ 7. Later in the day on October 14, Stolarz entered a Chase Manhattan branch at Penn Plaza with the knife. PSR ¶ 8. Stolarz demanded money from an Assistant Branch Manager and threatened to stab her. PSR ¶ 8. He also approached an Assistant Manager, pointed the knife at him, and threatened to stab him and to stab a customer. PSR ¶ 9. Stolarz ultimately left the bank without obtaining any money. PSR ¶ 10. Police officers quickly located him and ordered him to drop the knife he was holding. PSR ¶ 10. When he refused, one of the officers shot him in the thigh, and he was arrested. PSR ¶ 10.

8

When I sentenced defendant nearly a decade ago I said:

> I've been doing this for 16 years now, 16 ½ years now, I have never encountered anything, anything like your criminal history . . . I don't believe it is possible to protect society from you any way other than by keeping you in jail. You deserve no mercy . . . The fact that you are old and may die in prison is a matter of indifference to me, given your record and given how you have chosen to live your life, and given the overwhelming need not to add to your long list of victims by exposing anybody to you in the future.

Dkt. 29-1 at 10, 14, 15.

So why should the Court show this man compassion now?

Stolarz able counsel, Annalisa Miron, acknowledges that Stolarz has a "lengthy criminal history" (understatement), and that the Court was indifferent at the time of sentencing to the prospect of him dying in prison; she asks nonetheless that the Court see Stolarz now in a different light. She suggests that "even at his advanced age, he is capable of reform." According to counsel, Stolarz attended Catholic services during his last stint in prison and that that has turned his life around. She says his new-found faith has "provided him a sense of purpose and commitment to leading a rule-following and law-abiding life during his imprisonment." Indeed, Cardinal Joseph W. Tobin, Archbishop of Newark, New Jersey, has written a letter in support of Stolarz motion, the Cardinal saying Stolarz attended Catholic mass at the prison where the Cardinal ministered, and that they had conversed on numerous occasions. *See* Letter of Cardinal Tobin, Defendant's Motion, Ex. E. Counsel says that defendant has been a "model prisoner for a decade"—and BOP records would bear that assertion out—which "demonstrates that change *is* possible even for people who have been deemed incorrigible." He is presently scheduled to be released in little over a year.

9

If it were not for defendant's extensive record—one reminiscent of the character played by Robert Redford in the 2018 film "The Old Man and the Gun"—I would release this soon-to-be 80 years old man who has served 90% of a 16 years sentence, and who will be eligible for release to a Residential Reentry Center in the next couple of months. Unfortunately, Stolarz has proven to be and incorrigible recidivist so the usual arguments about how the elderly are unlikely to recidivate ring hollow in this case.

But the fact is that Stolarz has not much longer to serve. He will be in residential reentry very soon. Accelerating that by placing him on strict home confinement with location monitoring is not inappropriate given the current circumstances.

The Federal Defenders have been working with former Governor Jim McGreevey, now the Chairman of the New Jersey Reentry Corporation, to formulate a robust plan that will support Stolarz's return to the community. According to McGreevey:

> John was a gifted student growing up. He subsequently studied at a Kansas City community college, earning two degrees, while also becoming fluent in English, Polish, and Spanish.
>
> John is presently residing at the Federal Penitentiary in Allenwood, PA, where he is currently incarcerated. He is currently confronting numerous health issues including polyneuropathy, polyarthritis, heart disease, thrombosis, hyperlipidemia, hypertension, and chronic bedsores. While at Bureau of Prisons, he served as a tutor for GED courses, taught English grammar and beginner Spanish to fellow inmates, and became a valuable teacher to his fellow inmates.
>
> At 79 years old, it is my impression that John would seek to return to New Jersey where the remnant of his family is located. New Jersey Reentry Corporation (NJRC) would seek to commence the reentry process by contacting his family to determine levels of support, while also registering John for Medicaid supported age appropriate independent living. In addition, it would be our intention to connect John with appropriate services, including medical and healthcare services, identification and driver's license, his interest and ability in securing part time employment, as well as any required psychiatric and mental health services. Should he be granted compassionate release, it is our intent that the NJRC can

10

provide John with the necessary supportive services to lead a healthy, productive, and law-abiding life.

Stolarz Motion, Exhibit C.

Stolarz motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) is granted. His sentenced is reduced to time served. Upon release, Stolarz shall serve an additional special period of 12 months of supervised release, during which he will be subject to the special conditions set forth in the judgment entered in this case on October 31, 2011 (Docket Entry #19), and an additional special condition of 12 months of home detention. During the home detention period, Stolarz may leave the approved residence only for medical treatment, religious services, and other activities approved by the United States Probation Office. Following the completion of the special period of supervised release, Stolarz will commence service of the three-year supervision period that was imposed on him by the October 31, 2011 Judgment, subject to the special conditions set forth therein.[4]

Dated: December 8, 2020

_____
Colleen McMahon
Chief Judge

---

[4] In addition to this memorandum decision, the Court will issue an accompanying order: "Order Granting Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)," for *inter alia* service on the BOP.